**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**BAUSCH & LOMB, INC. and Daniel G. Schuman, Defendants.**

**No. 73 Civ. 2458.**

United States District Court, S. D. New York.

Sept. 16, 1976.

---

William D. Moran, Regional Administrator, Securities and Exchange Commission, New York City, for plaintiff; Alfred E. T. Rusch, Neil S. Lang, Benjamin Greenspoon, United States Securities & Exchange Commission, Division of Enforcement, Washington, D. C., of counsel.

Nixon, Hargrave, Devans & Doyle, Rochester, N. Y., for defendant Bausch & Lomb, Inc.; William H. Morris, John Stuart Smith, Rochester, N. Y., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Daniel G. Schuman; Arthur L. Liman, Lewis A. Kaplan, Adele R. Wailand, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") seeks to permanently enjoin defendants Bausch & Lomb, Inc. ("BOL") and Daniel G. Schuman ("Schuman") from violating § 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), (15 U.S.C. § 78j(b)), and Rule 10b–5 promulgated thereunder (17 CFR § 240.-10b–5).

### Introduction

The broad anti-fraud provisions, § 10(b) of the 1934 Act and Rule 10b–5, are an essential part of American securities law. Section 10 declares it "unlawful for any

person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. Pursuant to this grant of authority, the Commission in 1942 promulgated Rule 10b–5, which reads:

"Employment of manipulative and deceptive devices. .

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(1) To employ any device, scheme, or artifice to defraud,

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

Both § 10(b) and Rule 10b–5 are designed to protect the unwary from the unscrupulous. In addition, they attempt to insure that even the most sophisticated investor is not duped simply because he is not privy to information made available only to a favored few. These enactments effectuate the goals which underlie our national system of securities regulation: full disclosure and prevention of unfair practices. Speaking for the draftsmen of § 10(b), Thomas G. Corcoran stated:

"Subsection (c) [§ 9(c) of H.R. 7852—later § 10(b)] says, 'Thou shalt not devise any other cunning devices' . . .

"Of course subsection (c) is a catch-all clause to prevent manipulative devices. I do not think there is any objection to that kind of clause. The Commission should have the authority to deal with new manipulative devices."

Hearings on H.R. 7852 and H.R. 8720 before the House Comm. on Interstate and Foreign Commerce 73d Cong., 2d Sess., 115 (1934).

Over the course of time, these provisions have generated a great deal of litigation, and a substantial body of law has developed around them. Yet their essential nature must not be lost sight of. In a recent 10b–5 opinion, *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283 (2d Cir. 1976), Judge Medina noted that, "[s]ince the time to which the memory of man runneth not to the contrary the human animal has been full of cunning and guile." *Id.* at 1287. Exceptional if not unique among 10b–5 cases, the instant matter involves a defendant who cannot fairly be described as a man "full of cunning and guile."

This man, nevertheless, is accused of "tipping" *i. e.*, disclosing material inside information in violation of Rule 10b–5.

*The Background Facts*

BOL, one of the country's leading manufacturers of optical products, is a publicly held corporation with its principal place of business in Rochester, New York. At the time of the events complained of and to date its stock has been traded on the New York Stock Exchange and the Pacific Coast Stock Exchange. BOL's business is divided into four product categories: Soflens; Ophthalmic Products; Scientific Instruments; and Consumer Products.

Since May 1971 Schuman has been Chairman of the Board of Directors of BOL. Between 1967 and 1971 he served as Executive Vice President for finance and administration. In that position, one of his responsibilities was the firm's relations with the financial community, including securities analysts.

BOL attracted the attention of many investors in 1971 because of the commercial introduction of an exciting new product, "Soflens," a soft contact lens. After the receipt of approval of their marketing from the United States Food and Drug Adminis-

tration ("FDA"), the lenses were first sold to practitioners (ophthamologists, optometrists, and opticians) in kits each holding 72 lenses; the practitioners could later purchase more lenses in whatever quantity they chose. BOL held a series of symposia in cities throughout the country between May and November 1971 at which the Soflens was introduced to the potential professional customers.

Substantial numbers of kits were sold in 1971, and this fact was reflected in BOL's earnings for that year. The company's earnings per share of common stock by quarter in 1970 and 1971 (before earnings from a 1971 acquisition and before extraordinary income) and for the first quarter of 1972 are set forth in the following table.

|                | 1970   | 1971   | 1972   |
|----------------|--------|--------|--------|
| First Quarter  | $ .36  | $ .27  | $ .68  |
| Second Quarter | $ .43  | $ .45  |        |
| Third Quarter  | $ .39  | $ .61  |        |
| Fourth Quarter | $ .35  | $1.02  |        |
|                | $1.53  | $2.35  |        |

In an article entitled "Bausch & Lomb Estimates '71 Net Soared Higher Than Anticipated Due to Soft Lens" which appeared in the Wall Street Journal of January 19, 1972, Staff Reporter David Brand wrote what purported to be the substance of an interview with Schuman. Prior to publication the article was not seen by Schuman or any other BOL official. Brand wrote:

> From Mr. Schuman's comments, it can be deduced that the lens contributed between 82 cents and $1 a share to the year's earnings; and that fourth quarter operating net rose sharply to $1.02 a share from an indicated 35 cents a year ago.
>
> Things are going to get even better for Bausch & Lomb, Mr. Schuman hinted. Earnings for the first quarter, he predicted, "should be pretty good," when compared with the 1971 fourth quarter. And for all of 1972, "the range (of earnings) is very considerable."
>
> The earnings impact of the soft lens in 1972, "should be very substantial," ac-

cording to Mr. Schuman. This can already be seen from the effect on the second half of 1971. In the fourth quarter, the earnings impact of the lens "was more than twice that of the impact of the lens in the third quarter," Mr. Schuman said.

Schuman was unhappy with Brand's account of his "predictions" of 1972 first quarter earnings. At trial, he testified that he made no comparisons to the previous year but simply said the first quarter earnings " 'should be pretty good,' period."

Analysts and the company anticipated a drop in Soflens sales in the first quarter of 1972. The symposia had concluded late in the preceding year, initial orders had been taken, and the products were being shipped. Subsequent sales would be replacements or new orders from presumably less interested practitioners who had not responded to the promotional campaign. Consumer acceptance was still a matter of speculation. Lewis A. Sanders ("Sanders"), an analyst with Sanford C. Bernstein & Co. ("Bernstein"), stated in a memorandum dated January 24, 1972, "we estimate that domestic inventory kit shipments will fall considerably in the first quarter [of 1972]. . . ."

A wave of adverse publicity developed about the Soflens in late 1971 and became more intense in the first quarter of 1972. Articles circulated in the press suggesting that soft contact lenses were liable to become contaminated and pose a health threat to their users. Other stories raised the spectre of FDA inquiries and the possibility of competition from other manufacturers. This "flak" reflected on the fortunes of BOL. The New York Stock Exchange ("NYSE") price of BOL dropped from $194.75 on January 28, 1972 to $145 on March 10 of that year.

On February 29, 1972, the firm of Smith, Barney & Co. withdrew its "buy" recommendation on BOL stock, citing three reasons for this action:

> 1. Recurrent negative publicity which questions both the safety and efficacy of soft contact lenses.

2. Periodic concern that the Food and Drug Administration /FDA/ may impose restrictive regulatory controls.

3. The possibility of competition.

In the midst of the rumors about contamination, a press release was issued by BOL on March 1, 1972 stating that Soflens shipments had been halted temporarily because of a leakage problem in the shipping vials but that they would resume the following day. In fact, shipments of Soflens began again on March 10, the delay occasioned because BOL was awaiting certain test results.

BOL's own confidence in its performance waned as the year progressed. The company internally predicted earnings of $1.04 in January but lowered them to $.95 in February and again to $.74 on March 9. This last revised internal earnings forecast was received by Schuman on March 13.

Schuman had been away on vacation in Mexico during the period February 23 to March 12, 1972. During his absence, securities analysts had requested appointments to speak with him and his secretary, who did not ordinarily schedule engagements without his knowledge, had set up several interviews.

Although he had misgivings about the meetings, Schuman decided to go ahead with them rather than appear to be "ducking" the analysts and their anticipated discussions of the decline in his company's stock. Additionally, he was interested in learning what the analysts were thinking and hoped that speaking with them would help to prepare him for a planned meeting with Dan Dorfman ("Dorfman"), Dow Jones staff reporter and Wall Street Journal columnist.

Inasmuch as the events which followed form the predicate of this action, further recitation of the facts is deferred. The major incidents out of which liability is said to arise will be analyzed later in this opinion in light of the applicable law.

*Corporate Communications with Securities Analysts*

At the heart of this controversy is a question of the permissible scope of communications between a corporate officer and securities analysts. Analysts provide a needed service in culling and sifting available data, viewing it in light of their own knowledge of a particular industry and ultimately furnishing a distilled product in the form of reports. These analyses can then be used by both the ordinary investor and by the professional investment adviser as a basis for the decision to buy or sell a given stock. The data available to the analyst—his raw material—comes in part from published sources but must also come from communication with management.

Both the NYSE and the SEC have encouraged publicly traded companies to maintain an "open door" policy toward securities analysts.

In an administrative proceeding, *Matter of Investors Management Co., Inc.,* Securities and Exchange Act Release No. 9267 (July 29, 1971, [1970–1971 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 78,163 (*"Investors Management"*), the Commission acknowledged the role of analysts and the potential benefit of meetings between them and corporate officials.

We appreciate the concerns that have been expressed about the need to facilitate the free flow of information throughout the financial community. We have consistently required or encouraged the broadest possible disclosure of corporate information so as to provide public investors and their professional financial advisers with the most accurate and complete factual basis upon which to make investment decisions. We also recognize that discussions between corporate management and groups of analysts which provide a forum for filling interstices in analysis, for forming a direct impression of the quality of management, or for testing the meaning of public information, may be of value.

*Id.* at 80,521.

In a footnote, it also dealt with the proper way to proceed should an inadvertent leak take place.

See also Haack, *Corporate Responsibility to the Investing Public*, CCH Fed.Sec.L. Rep. ¶ 77,554 at 83,173: "If during the course of discussion [between the issuer and analyst], some important information is divulged that has not yet been published—information which could affect the holdings or investment decision of any stockholder—that information should be made the subject of an immediate and comprehensive news release." *Id.* at 80,-521, n. 27.

Statements regarding the appropriate scope of conversations between securities analysts and corporate insiders had also been issued by staff and members of the SEC. Such statements were, of course, prefaced by the standard disclaimer to the effect that the Commission's policy is to abjure responsibility for private publications by its employees and that opinions so expressed are solely those of the individual authors. In the absence of official pronouncements on a topic of considerable concern, however, it ill behooves the Commission which often rightly seeks to impose liability on agency principles, to assert that remarks made by its "insiders" will not bear on how individuals attempt to conform their conduct to the law.

The available guidance, scanty as it was, suggested that corporate officials should conduct themselves reasonably and that this standard would permit general discussion out of which a skilled analyst could extract pieces of a jigsaw puzzle which would not be significant to the ordinary investor but which the analyst could add to his own fund of knowledge and use toward constructing his ultimate judgment. Discussions with analysts regarding earnings prospects, trends in products, operating conditions, and the implications on earnings of a particular volume of business were approved. Responses to "ball park" estimates were deemed proper. This, of course, assumed management was, "not trying to give their stock a little jiggle," and did not "go overboard." [1]

1. These materials provide background and assist the Court in framing a context for the facts of this case.

In 1968, then General Counsel of the SEC, Philip A. Loomis, Jr., participated in a panel interview entitled "Corporate Disclosure and Insider Information." The following pertinent exchanges took place.

MR. PARKER:
What would you suggest that an analyst or a stockholder could do when he is confronted with the problem of a company management who states that "On advice of counsel, we can't talk with you"—first, let us say, "at all"?

MR. LOOMIS:
Well, as I have said earlier, I believe that advice is incorrect. Your association has already, I gather, announced publicly that in their view it's incorrect; I concur.

MR. PARKER:
I suspect maybe the answers are the same as if the company should say, "I can't talk about anything that's not already been communicated to our stockholders," or to some broad segment of the public?

MR. LOOMIS:
That is a very nice and cautious course, but I don't think the law requires it. Again, the test that the stock exchange suggests is, "Is this confidential information which the company wouldn't give to a person who came in and asked for it? Are they slipping it to this particular analyst because they expect something in return?" Then, you've got a problem.

But aside from that, I don't think the mere fact that it has not already been disseminated—perhaps because the company doesn't want to send their stockholders something the size of a telephone book—makes it improper for them to tell an analyst.

MR. PARKER:
Would not make it improper?

MR. LOOMIS:
That's right.

MR. PARKER:
Or, suppose the management says, "We can't talk without the advice of counsel about earning prospects"?

MR. LOOMIS:
Well, there, as you know, we are on more sensitive ground. I think that a corporation has no legal obligation to decline to talk to a competent and responsible analyst about earning prospects, provided they don't go overboard and are not trying to give their stock a little jiggle. And it's up to the analyst to tell the difference, and I suspect most of you can.

MR. PARKER:

Or, if the management should say, "We can't talk about the trends in our business prospects?"

MR. LOOMIS:

I think they can and should.

After a series of questions regarding the propriety of discussions about industry conditions and other industry matters, Mr. Loomis engaged in the following exchange.

MR. WRIGHT:

Would any of the subjects that I have asked questions on in the last few minutes be the kind of information that would require a public disclosure to the press, or is this background information of the kind that is helpful only to a careful student and hence is not necessary to be disseminated widely? Also, in my opinion, some of these things are the kind of material, sir, that a company officer doesn't want to be quoted on.

MR. LOOMIS:

Well, it seems to me that this is a type of question your group are really better qualified to answer than I am. Obviously, some of this information is important; on the other hand, some of it, I suspect, is not, so to speak, suitable for general dissemination to the press, nor would the press in some instances be interested in it. The problem is that of drawing the line between the type of information which any individual must recognize as significant and make use of it and the type which takes some of the skills which you have. And I would guess that much of this is in the latter category.

On the subject of earnings, the interview included several exchanges.

MR. WRIGHT:

\* \* \* \* \* \*

Now, with regard to future earnings, quite often company officials will, at the time of the annual meeting, express the belief or perhaps hope that the earnings for the then current year will be somewhat more than the earnings that have been reported for the year just finished. Later on in the year would it be proper for an investor, shareholder or analyst to discuss with the management operating conditions in the light of those expected at the time that statement was made at the annual meeting?

MR. LOOMIS:

Yes, and I think it could well be useful.

MR. WRIGHT:

Would it be proper for a company officer to discuss the implications on earnings of a volume of business somewhat larger than that forecast at the time of the annual meeting?

MR. LOOMIS:

Yes, provided they don't go overboard.

MR. WRIGHT:

How about discussing the implications on earnings of a disappointing level of business?

MR. LOOMIS:

Surely, if they want to.

MR. WRIGHT:

Could they properly discuss the rising cost of overhead and the increased volume needed to maintain their earnings at the level of the recent past?

MR. LOOMIS:

I think they could, and, again, I welcome this.

MR. WRIGHT:

Can one properly discuss break-even points?

MR. LOOMIS:

Yes, and people do, as I understand. We've never objected.

MR. WRIGHT:

Quite often a company officer will be asked by someone who is making estimates, "I am estimating $5.00 per share this year. Am I in the ball park?"

MR. LOOMIS:

I gather this deals with a situation where the analyst has made his own estimate and he wants to cross-check with the company to see that it is not too far out of line. That, I think, is entirely proper and might provide a useful check on the analyst's work. On the other hand, as the stock exchange points out, the company should be careful not to underwrite the analyst's projections as their own, unless they are in a position, by reason of knowledge of how good it is and what he has done, to be sure that it is a reasonable estimate.

MR. WRIGHT:

Now, just one question, sir, and I'm through. In the January-February issue of the *Harvard Business Review*, 1967, Arthur Fleischer, Jr. wrote an article "Corporate Disclosure/Insider Trading", which I recommend that you all read. In this article he said: "Company officials, however, are often confronted with projections made by brokerage firms and investment banking houses and asked to confirm these figures. Here again, I think the conservative course of action would be to decline comment on the projection. At the same time, it would be appropriate to call the analyst's attention to any egregious error in his assumptions or calculations."

I am wondering about a hypothetical case where several people are publishing estimates that are far off the mark. Would it be proper for the company officer to call to the attention of these people the exuberance of these estimates?

MR. LOOMIS:

This is the same thing that I was discussing earlier. I can see how Art Fleischer would suggest the cautious course for company management so as to dissociate themselves as far as possible from the projections when they do not know how they were arrived at. On the other hand, I do feel that a service might be done by corporate management in calling attention through the appropriate channels to the institution whose forecasts

## Liability

This Court's jurisdiction is predicated upon § 27 of the 1934 Act (15 U.S.C. § 78aa). As an "instrumentality of interstate commerce" was used by defendants, *Myzel v. Fields*, 386 F.2d 718, 727 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), the jurisdictional reach of Rule 10b–5 is satisfied.

For purposes of an SEC enforcement proceeding seeking injunctive relief, the elements of a Rule 10b–5 violation include disclosure of material, non-public corporate information and a connection between this disclosure and the purchase or sale of a security. *See SEC v. Lum's, Inc.*, 365 F.Supp. 1046, 1060–61 (S.D.N.Y.1973)

("*Lum's*"). The level of defendants' culpability is also a concern. These elements will each be looked at separately.

## Materiality

The facts of this case must be examined in light of the elusive concept of materiality. Whether or not any particular fact is material is a determination which clearly cannot be made in a vacuum. Each individual case must be viewed as a discrete set of circumstances and judged on its own unique facts. *SEC v. Geon Industries, Inc.*, 531 F.2d 39, 47–48 (2d Cir. 1976) ("*Geon*"); *SEC v. Shapiro*, 494 F.2d 1301, 1306 (2d Cir. 1974) ("*Shapiro*"). The standard of materiality should not be unduly hypothetical or speculative.[2]

have been circulated around the market that, in the opinion of management, that is just plain wrong.

"Information and the Securities Markets" was the topic of a 1968 speech by then Commissioner Richard B. Smith. He had this to say about communications with analysts.

The concern in the investment community on how *Texas Gulf* may affect relations between corporations and outside securities analysts is understandable. In this particular area there may even be some conflict between the two underlying purposes of Rule 10b–5. On the one hand, disclosures to securities analysts do serve as a means of conveying information to the investing public. This is particularly true since analysts will often be in a position to collect, evaluate and translate information into more meaningful form than would directly interest the average investor in its raw state. On the other hand, disclosures made to particular analysts for the first time will necessarily reach their own subscribers before they reach the remainder of the investing public.

I do not think that this problem is insoluble, or that corporations can do no more than regurgitate their prior public disclosures to analysts. There is nothing inherently wrong in meeting with analysts either singly or in groups. In my opinion, management is not prohibited from giving previously undisclosed information to a particular analyst if the same information would be given to any other responsible person who took the trouble to ask, and if the information is not of such major significance that fairness requires that it be given to all investors simultaneously through the news media. Of course, we are all human, and there may be times when information of an extraordinary nature slips out, either in answer to a perceptive question or in the course of a heated discussion. In

that case the corporation should issue a press release as soon afterwards as possible. I understand this to be essentially the position spelled out in the New York Stock Exchange's Company Manual, and I am in accord with it.

Mr. Smith again spoke in 1969 on the subject of "Corporate Disclosures to Security Analysts." He indicated that so long as management did not favor one analyst over another, it was permissible to disclose information not previously published if it was not material.

If the information is material, and it has not been previously published by the corporation, then we must ask whether the analyst is receiving information that is not available to the rest of the investing public. If the information is extraordinary in nature, then it seems to me it must be published before or concurrently with the time it is being given to a single analyst or to a group of analysts. The analyst and his clients are not entitled to any head start over the rest of the public. Of course, I recognize that, in answer to an especially perceptive question, a corporate official may on occasion say something that he did not intend to disclose in this manner. If he promptly arranges for the publication of this information and requests the analyst not to use it until this has been accomplished, I don't think that the corporate official should be censured because of a purely understandable mistake that he properly sets out to correct.

2. The definition of materiality is significant throughout the securities laws. In a case involving Rule 14a–9 (17 CFR § 240.14a–9), promulgated under § 14(a) of the 1934 Act (15 U.S.C. § 78n(a)) the Supreme Court recently grappled with the meaning of this term. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ("*Northway*").

The probable impact of any individual fact upon the reasonable investor can only be ascertained in light of all the information available to him at the time of his decision. In describing a material tip the SEC has said, "[t]he information's significance was immediately clear; it was not merely one link in a claim of analytical information." *Investors Management* at 80,519. As recently stated by Judge Weinfeld of this Court,

> The adequacy of disclosure of material information must be evaluated by a consideration of the "total mix" of all information conveyed or available to investors.

*Speilman v. General Host Corp.*, 402 F.Supp. 190, 195 (S.D.N.Y.1975).

With these principles in mind, the Court has considered the incidents which the SEC contends resulted in the disclosure by BOL and Schuman of material non-public corporate information amounting to violations of § 10(b) and Rule 10b–5.

*March 15, 1972*

Mr. Sanders, the analyst of the Bernstein firm met with Schuman on the afternoon of March 15, 1972. The following day, Sanders confirmed his extant "buy" recommendation on BOL stock, and his firm bought 850 shares for discretionary accounts.

The Court of Appeals for the Seventh Circuit had used as a standard in *Northway* the notion that a fact was material if a reasonable investor *might* consider it important. The Supreme Court regarded this formulation as too hypothetical and stated:

> The general standard of materiality that we think best comports with the policies of Rule 14a–9 is as follows: an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* [*Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)] general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in

Although the conversation dealt with essentially the same subjects covered at Schuman's later meetings with other analysts on March 15 and 16, the SEC does not assert that any liability arises from the Sanders interview.

As Sanders left Schuman's office, Byron Wien ("Wien") and Richard J. Clancy ("Clancy"), partners in the firm of Brokaw, Schaenen, Wien, Clancy & Co. ("Brokaw"), arrived for their scheduled interview.

The Commission claims that in the course of his meeting with Wien and Clancy, Schuman made the following improper revelations:

A. That an earnings estimate of $5.00 per share for BOL common stock in 1972 then being used by financial analyst, Lewis Sanders was optimistic and that Sanders ought to be more conservative;

B. that an earnings estimate of $3.00 per share for BOL common stock for 1972 was too low;

C. that BOL was not going to introduce the Aphakic lens in the first quarter of 1972 and that it would be introduced at the end of April or the beginning of May;

the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

426 U.S. at 449, 96 S.Ct. at 2133.

Should this statement be taken as an implied directive that the *would* definition of materiality must be applied in Rule 10b–5 cases? It is reasonable to draw this conclusion. The Court indicated approvingly that this standard has been applied where other portions of the statutes regulating securities transactions were under litigation. 426 U.S. at 445, n. 8, 96 S.Ct. at 2131. In particular, § 10(b) is cited numerous times. *Id.*

Additionally, the Court, in *S. D. Cohn & Co. v. Woolf,* vacated and remanded a decision of the Fifth Circuit involving Rule 10b–5, 515 F.2d 591 (5th Cir. 1975) for further consideration in light of *Northway.* —— U.S. ——, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976).

D. that the minikit would not be out for the first quarter;

E. that BOL could no longer make the statement that Soflens sales were increasing on a week-to-week basis, that Soflens sales had flattened out and that BOL's Soflens sales were being seriously hurt by the flak;

F. that BOL was revising its internal estimates of earnings downward;

G. that the Soflens sales rate was less than a prior estimate of one lens per practitioner per week.

The evidence concerning the revelation of earnings estimates by Schuman during his talk with Wien and Clancy is not convincing; it cannot fairly be said that Schuman made statements which could be characterized as disclosures of earnings.

The materiality of the time of introduction of the two products—the aphakic lens and the minikit—has not been established. Schuman testified that he said that the aphakics would be out in late April or in May and the minikit at the end of March. The BOL Marketing Division had been answering customer inquiries with similar information.

> *TGS* [*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)] makes clear that not only the probability of an event but also the magnitude of its potential impact on a company's fortunes are relevant to the determination of materiality
>
> . . ..

*Geon, supra* at 47.

The potential financial impact of the later introduction of the two products seems insubstantial. An internal forecast of sales of the aphakics for the first quarter of 1972, made in February, estimated receipts of $480,000. At the same time, the estimate for the minikits was $540,000, the two aggregating $1,020,000. Total sales for the first quarter were $42,960,000.

Schuman testified that he attached no significance to the date of the introduction of the two products. Clancy did not even recall any conversation regarding the aphakic lens.

The context in which Schuman discussed declining sales does not permit characterization of the statements as disclosure of inside information. Wien and Clancy appear to have been well aware of the problems "flak" was creating for BOL. They advocated a strong public relations campaign to off-set the damage. In Schuman's words, "[t]hey were telling me that everything was going to hell. . . ."

Wien left BOL's offices dissatisfied with the company's approach to marketing the product, and believing that Brokaw should sell its holdings. Clancy felt his firm should cut back its position but retain about two-thirds. The following day both men spoke at a Brokaw partnership meeting which concluded with a decision to sell the firm's BOL stock. Subsequently, on March 16, 72,000 shares of BOL common were sold on the NYSE.

Although surely not dispositive of this mixed question of fact and law, Clancy's testimony before the SEC is nonetheless instructive:

> Both Mr. Wien and myself in going back and forth in this conversation agreed that we had not received any specific earnings estimate from Mr. Schuman for the year, that we had not received a specific earnings estimate from him for the first quarter, that our impressions coming out of the interview had really been subjective, qualitative evaluations based on our knowledge of the company and not the fact that Mr. Schuman had given us quantitative information with any kind of specificity to it.

The Court finds that the remarks made by Schuman during his March 15 interview do not rise to the level of disclosure of material, non-public information.

*March 16, 1972*

On March 16, 1972 Schuman met with David H. MacCallum ("MacCallum") an analyst with the firm of Faulkner, Dawkins & Sullivan ("FDS"). Before considering the statements which were made it is helpful to

examine MacCallum's relationship with BOL stock prior to and at the time these events took place.

MacCallum concentrated his professional energies primarily on the health industry and in early 1971 devoted a considerable amount of time to following BOL. Believing that the Soflens was a highly significant product with considerable potential, he had done a good deal of research and even went so far as to try a pair of the lenses in his own eyes as well as a competitor's product which had not then received FDA approval.

Yet the events of 1972 caused MacCallum to reevaluate his position. An FDS study of practitioners indicated a lower rate of acceptance than he had anticipated. He was well aware of the "flak".

MacCallum decided that it was time to withdraw his "buy" recommendation on BOL and communicated this opinion to Dwight Faulkner, managing partner at FDS in mid to late February or possibly early March of 1972. Faulkner urged a visit to the company prior to any withdrawal. However, Schuman's absence from Rochester made it impossible for MacCallum to meet with him until mid-March and consequently delayed his change of recommendation.

FDS published a company bulletin dated March 2, 1972 dealing with BOL and prepared by MacCallum. In this bulletin, MacCallum estimated that BOL would ship 6,400 kits in 1972, 800 of them in the first quarter. In a draft report dated February 22, 1972 he had predicted total kit sales of 11,600 for the year, 1,900 of these in the first quarter. MacCallum's earnings projections were not altered between the draft and the final report, however, because of Faulkner's admonition to visit the company first.

FDS customers were informed of the impending visit; Derrick C. Hoitsma ("Hoitsma"), manager of the FDS trading department who was troubled by the action of the stock, requested that MacCallum telephone him at the conclusion of the interview.

The long awaited meeting between Schuman and MacCallum took place on March 16 at about 9:00 A.M. The discussion continued at BOL's offices for approximately two hours and was extended for a short period while Schuman drove MacCallum to downtown Rochester. The former was going to attend a bank board of directors' meeting while the latter planned to fly back to New York City.

The SEC asserts that Schuman violated § 10(b) and Rule 10b–5 during his March 16 interview with MacCallum through disclosures substantially similar to those alleged in regard to the Wien and Clancy meeting; delays in the introduction of the aphakic lens and the minikit, a reduction of Soflens sales, and earnings estimates. A review of the testimony of both participants gives the impression of a very knowledgeable analyst having undertaken considerable research and having subsequently formulated certain opinions which he sought to verify in his discussion with Schuman. On the other hand, Schuman appears to have attempted to candidly discuss that which was general knowledge among those in the investment community who followed BOL stock while parrying efforts to lure him into forbidden territory. Evidence that Schuman overstepped the bounds of proper disclosure in his March 16 interview with MacCallum was not conclusive.

As in the Wien and Clancy meeting of the previous day, the materiality of a delay in the introduction of the aphakic lens and the minikit was not established. MacCallum testified that the time of their introduction was not significant to him in his analysis of the company. The Commission did not prove that any earnings estimates for BOL's traditional lines were released but even had they been, their materiality, in light of investor fixation on Soflens, would be doubtful. It was apparent from the testimony of both participants that Schuman did not reveal earnings figures the morning of March 16.

The SEC has contended that the behavior of the analysts—Wien, Clancy, and MacCallum—after their interviews on March 15

and 16, demonstrates that Schuman disclosed material non-public information. Cited for this proposition are *Geon* and *Shapiro,* in which the Second Circuit viewed as evidence of materiality tippee purchases soon after receipt of inside information. However, both of these opinions cite to the following passage in *TGS, supra* at 851:

Finally, a major factor in determining whether the K–55–1 discovery was a material fact is the importance attached to the drilling results by those who knew about it. In view of other unrelated recent developments favorably affecting TGS, participation by an informed person in a regular stock-purchase program, or even sporadic trading by an informed person, might lend only nominal support to the inference of the materiality of the K–55–1 discovery; nevertheless, the timing by those who knew of it of their stock purchases and their purchases of *short-term* calls—purchases in some cases by individuals who had never before purchased calls or even TGS stock—virtually compels the inference that the insiders were influenced by the drilling results. This insider trading activity, which surely constitutes highly pertinent evidence and the only truly objective evidence of the materiality of the K–55–1 discovery, was apparently disregarded by the court below in favor of the testimony of defendants' expert witnesses, all of whom "agreed that one drill core does not establish an ore body, much less a mine," 258 F.Supp. [262] at 282–283. Significantly, however, the court below, while relying upon what these defense experts said the defendant insiders *ought* to have thought about the worth to TGS of the K–55–1 discovery, and finding that from November 12, 1963 to April 6, 1964 Fogarty, Murray, Holyk and Darke spent more than $100,000 in purchasing TGS stock and calls on that stock, made no finding that the insiders were motivated by any factor other than the extraordinary K–55–1 discovery when they bought their stock and their calls.

Certainly the motivations behind the trading activity here cannot be so definitely pinpointed. The "dark cloud" which hung over BOL at this point makes it difficult to draw the inference that the analysts' reactions establish material revelations.

Furthermore, the analysts' reactions were by no means uniform. Sanders chose to recommend the purchase of BOL stock. Wien and Clancy, whose concern seems to have focused on the firm's marketing techniques, split, with Wien advocating sale while Clancy urged retention of two-thirds of the Brokaw holdings. MacCallum's decision to withdraw his "buy" recommendation, according to his testimony, was formulated prior to his trip to Rochester. No fact relayed to him by Schuman changed his opinion of the stock. In sum, the purported tippee reaction following the March 15 and 16 interviews does not lead to a finding of materiality.

■ Viewing the "total mix" of available information, this Court finds that the SEC has not established that Schuman violated § 10(b) and Rule 10b–5 in the course of the interviews of March 15 and 16. What information he did convey did not constitute anything beyond "link[s] in a chain of analytical information." *Investors Management, supra* at 80,519.

The main thrust of the SEC's attack is directed at the events on the afternoon of March 16, 1972. Although the Commission points to disclosure by Schuman to several individuals, the entire unhappy scenario basically grew out of a single telephone conversation with MacCallum.

After leaving Schuman, MacCallum phoned Hoitsma as had been pre-arranged and told him that he was reducing his earnings estimates for BOL for the first quarter from $.90 to $.60–$.70 and from $6 to $4 for the year and that he was withdrawing his buy recommendation. Hoitsma proceeded to sell 2,320 shares of BOL common stock which were under his control.

Schuman attended the aforementioned bank board meeting and then returned to BOL's offices at about 2:00 P.M. where Jack Harby ("Harby"), president of the company, told him that Harby had received a telephone call from an analyst relaying a

rumor that Schuman had released a first quarter earnings estimate of $.60 to an analyst from FDS. Concluding that an immediate press release was in order, Schuman summoned the company's financial officers.

He also directed his secretary to place a call to MacCallum's office at FDS. The call was placed at 2:24 P.M. and Schuman spoke with MacCallum who he had not expected to find in. Schuman reported the rumor to MacCallum who said that it was untrue and that the earnings estimate of $.60 was MacCallum's own. Schuman responded that the $.60 estimate was low and that $.70 to $.80 per share was more like it. A short time after the phone call concluded, Schuman was told by the financial officers at BOL that $.65 to $.75 per share was a more realistic figure, and he immediately telephoned MacCallum to correct the earlier estimate.

Very soon after his second telephone call to MacCallum, Schuman communicated with Dorfman, the previously mentioned Dow Jones staff reporter and Wall Street Journal columnist, and gave him the $.65 to $.75 earnings estimate for publication.

At about the time of the first call to MacCallum, James Gary Burkhead, an analyst with Smith, Barney, Harris, Upham, who had been waiting for a scheduled interview with Schuman, was ushered into the latter's office where he was to remain throughout the afternoon. Listening to what transpired, Burkhead suggested that Schuman consider getting out a press release. Schuman indicated that he felt he had disseminated the information through Dorfman.

BOL's switchboard was inundated with calls, a few of which were transmitted to Schuman. He released the $.65 to $.75 figure to Frank Baker of American Express, Roy Furman of Seiden and deCuevas, Sheldon Greenberg of Investors Diversified Services, a person named Blanks of Morgan Guaranty, two people named Einhorn and Scher, and a stockholder Dugan. Schuman informed these callers that he had given the estimate to the Wall Street Journal and

anticipated that it would appear in print the following day. All the calls, with the possible exception of Mr. Baker's, took place after 3:30 P.M. eastern standard time. Schuman testified that he did not know if BOL was traded on the Pacific Coast Stock Exchange.

Dorfman's article regarding the BOL earnings estimate was published in the Wall Street Journal on March 17 and indicated that the figures had been leaked to MacCallum during his Rochester visit. On that same day, the company, at the request of the NYSE, put out a press release reporting expected first quarter earnings of $.65 to $.75 per share.

BOL's market price on March 16 closed at $125.25, off $11.75 a share from the previous day's close. The volume was 348,000 shares; March 15 trading had involved approximately 46,000 shares. The stock did not open for trading on March 17 because of a rash of sell orders. Trading resumed on March 20 with a volume of 171,300 shares. The closing price on March 20 was $105.00.

■ Schuman's release of an earnings estimate to MacCallum over the telephone did constitute the disclosure of material, non-public corporate information. Obviously, an estimate of earnings is among the most material of all conceivable revelations. *TGS, supra* at 849.

This proposition, however, is not conclusive of the existence of a Rule 10b–5 violation. The Rule includes the phrase, "in connection with the purchase or sale of any security." An improper disclosure alone will not breach the law; the "in connection with" requirement must also be met. *See Lum's, supra* at 1057.

*"In Connection With . . . ."*

The Court is therefore bound to ask whether any purchase or sale resulted from Schuman's telephone revelation to MacCallum. At about 3:00 P.M. on March 16, MacCallum had a meeting regarding BOL with FDS salesmen. The SEC points out the actions of Douglas Campbell ("Campbell") of Campbell Asset Management Com-

pany who was present at the FDS meeting on March 16 and subsequently sold 3,000 shares of BOL stock on that date. However, the Commission did not establish that this sale was made on the basis of the leaked earnings estimate.

MacCallum came to Rochester wanting to withdraw his recommendation of BOL stock. He testified that his decision did not change after his visit nor after the telephone conversations. MacCallum's own earnings estimate was below that leaked by Schuman. It was not established that MacCallum attributed earnings estimates to Schuman when he addressed the FDS meeting.

Certainly other negative pressures were at hand and could have influenced a sale. Rumors were circulating about the threat of a Senate investigation of soft contact lenses. At 4:11 P.M. on March 15, the Dow Jones Wire Service carried a press release issued by Warner-Lambert, the parent company of American Optical Company, the largest firm in the ophthalmic industry. The release stated:

> WARNER–LAMBERT CO AND FRIGITRONICS INC ANNOUNCED JOINTLY THAT PREVIOUSLY–ANNOUNCED DISCUSSIONS CONCERNING THE MANUFACTURE AND DISTRIBUTION OF THE GRIFFIN SOFT HYDROPHILIC CONTACT LENS BY WARNER–LAMBERT AND ITS SUBSIDIARIES ARE PROGRESSING SATISFACTORILY.

This announcement, threatening competition, "scared the heck out of" one investor, Ronald LaBow. On the strength of it he sold approximately 100,000 shares of BOL on the morning of March 16. This sale accounted for nearly one-third of BOL's total volume on the NYSE that day.

The Commission has failed to adduce evidence as to the reasons behind Campbell's sale. Campbell himself did not testify although listed among plaintiff's witnesses; nor was his deposition introduced. It would not be unreasonable to infer that Campbell sold on the strength of MacCallum's appraisal independent of Schuman's disclosure

or, quite as likely, that his sale was motivated by the entire mix of factors then present.

It has been stipulated that during the time frame February 10, to and including March 20, 1972, neither Schuman nor any of BOL's other officers and directors sold BOL stock held by them in their own right or as beneficial owners within the meaning of the 1934 Act.

Although the Commission has failed to prove that any specific person sold BOL stock on the basis of Schuman's disclosure, this may not be dispositive of the "in connection with" requirement. The significance of that phrase must be examined. In *TGS*, the district court found that "[t]he issuance of the release produced no unusual market action," and concluded that it had not been released "in connection with the purchase or sale of any security," since there was no showing that its issuance was designed to rig the price of the stock. 258 F.Supp. 262, 294 (S.D.N.Y.1966).

The Second Circuit rejected this approach, stating that:

> [I]t seems clear from the legislative purpose Congress expressed in the Act, and the legislative history of Section 10(b) that Congress when it used the phrase "in connection with the purchase or sale of any security" intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities. 401 F.2d at 860.

In these terms, the "in connection with" requirement seems to differ little from another 10b–5 element, materiality. Commenting on the majority's construction in his dissent Judge Moore observed:

> The Commission advances the argument (successful with the majority) that the "in connection" requirement is satisfied by the mere fact that the public is purchasing and selling securities on the open market. Thus any statement issued by a publicly listed company is made "in

connection" with the purchase or sale of securities.

401 F.2d at 882–83.

See also, Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12–13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Lum's, supra at 1059.

Although the expansive definition of the "in connection with" requirement quoted above may be dubious in light of recent Supreme Court trends, see generally Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), it is apparently still good law in this Circuit. And, the facts of this case seem to satisfy it.

Yet, it is unnecessary for this Court to reach a determination of the "in connection with" question, since liability in this action hinges upon still another element.

*Scienter*

During the trial of this case, the United States Supreme Court handed down a landmark decision, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("Hochfelder"). The Court determined that an action for civil damages under § 10(b) and Rule 10b–5 may not lie in the absence of an allegation of scienter —intent to deceive, manipulate, or defraud. In this Circuit, in contrast, negligence had been held to suffice in suits where the SEC sought injunctive relief. SEC v. Management Dynamics, Inc., 515 F.2d 801 (2d Cir. 1975) ("Management Dynamics"); SEC v. Spectrum, Ltd., 489 F.2d 535, 541 (2d Cir. 1973); TGS, supra at 854–55.

In a footnote to Hochfelder, the Court observed that, "[s]ince this case concerns an action for damages we . . . need not consider the question whether scienter is a necessary element in an action for injunctive relief under § 10(b) and Rule 10b–5." 425 U.S. at 194, n. 12, 96 S.Ct. at 1381. The holding clearly cannot simply be applied without extrapolation to the instant case. Instead, its import must be closely examined.

The Court addressed much of its discussion to the amicus curiae brief of the SEC. Its conclusion was based upon four grounds.

First, the language of § 10(b) which speaks of "any manipulative or deceptive device or contrivance," is plainly directed at intentional wrongdoing. Secondly, the legislative history suggests that § 10(b) was directed at practices involving scienter.

Next, the Court examined other sections of the securities laws, pointing out instances where recovery for negligent conduct was intended and was thus expressly provided and at the same time was circumscribed by certain procedural restrictions. Finally, Rule 10b–5 itself was scrutinized and the conclusion drawn that when promulgated, the Rule was aimed at behavior involving scienter. Referring to its earlier discussion of § 10(b), the Court said:

[D]espite the broad view of the Rule advanced by the Commission in this case, its scope cannot exceed the power granted the Commission by Congress under § 10(b). For the reasons stated above, we think the Commission's original interpretation of Rule 10b–5 was compelled by the language and history of § 10(b) and related sections of the Acts.

425 U.S. at 214, 96 S.Ct. at 1391 (citations omitted).

This Court believes that the Hochfelder holding must be read to impose a scienter requirement in this suit for injunctive relief brought by the SEC. Although not obliged to reach the question by the facts of that case, the Supreme Court used reasoning which appears to compel that result.

The Supreme Court found, "the language and history of § 10(b) dispositive." 425 U.S. at 214, n. 33, 96 S.Ct. at 1391. These stand at least as conclusively when the SEC is plaintiff. The private damage action brought under this section is a creation of the courts. Blue Chip Stamps v. Manor Drug Stores, supra, 421 U.S. at 730, 95 S.Ct. 1917; Affiliated Ute Citizens v. United States, 406 U.S. 128, 150–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Superintendent of Insurance v. Bankers Life & Casualty Co.,

*supra,* 404 U.S. at 13, n. 9, 92 S.Ct. 165. If the "language and history of § 10(b) [are] dispositive" as to the *scienter* question in private actions, must they not also be so in "SEC suits for injunctions [which] are 'creatures of statute'." *Management Dynamics, supra* at 808. Argument drawing upon the words of § 10(b) and the history, legislative and administrative, of both § 10(b) and Rule 10b–5 applies equally to private suits and actions brought by the Commission. Only policy considerations—which have traditionally been applied to distinguish the two kinds of cases—*TGS,* at 868 (Friendly, C. J., concurring) could support a contrary argument yet the Court noted:

"As we find the language and history of § 10(b) dispositive of the appropriate standard of liability, there is no occasion to examine the additional considerations of 'policy,' set forth by the parties, . . ."

425 U.S. 214, n. 33, 96 S.Ct. at 1391.

As this Court reads the majority opinion in *Hochfelder, scienter* must be pleaded and proved whether suit is brought by the SEC or by a private litigant.

■ Having concluded that "*scienter*"—intent to deceive, manipulate, or defraud—is an essential element in this action for injunctive relief, this Court must now examine the facts to determine whether or not it was present. Did Schuman possess the intent to deceive, manipulate, or defraud when he spoke over the telephone to MacCallum on the afternoon of March 16, 1972, or, for that matter, on any of the occasions described in this lawsuit? This Court finds that he did not.

At trial, Schuman endured a lengthy stint on the witness stand and there was ample opportunity to observe his demeanor.[3] *See SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1101 (2d Cir. 1972) ("*Manor Nursing Centers*"). His behavior is clearly distinguishable from Chasen's practice of intentional favoritism of a particular securities salesman in *Lum's*; Berman's "driving cupidity and lack of principle and restraint," in *Shapiro, supra* at 1308; or any other of the forms of chicanery which are so characteristic of 10b–5 cases.

---

**3.** In testifying about the fateful telephone call of March 16, Schuman gave the following account in response to a question as to why he gave MacCallum the earnings figure:

A. Well, that is a question I have asked myself a thousand times.

(Pause)

THE COURT: Take as long as you require. It is an important question.

THE WITNESS: It is not that I am thinking. It is just a very painful thing.

THE COURT: I can appreciate it must be. But, at the same time, take your time and respond to the question, which is a rather broad question.

A. (Continuing) I was agitated. I was extremely agitated when Mr. Harby told me that—what he did—I don't have to repeat all that—and I was—I instantly decided that I was going to go with a number.

That is why I called our financial people down. I certainly didn't expect to talk to MacCallum. I certainly didn't expect to—obviously it was the furthest thought from my mind to give a number to MacCallum at that point.

I certainly was agitated, but I felt before talking to the Wall Street Journal, because I also had made up my mind I was going to the Wall Street Journal route as the fastest route, and it was just a—I was moving very fast, I was very intense about it. I don't know that I can really rationalize what I did. It popped out. Why it popped out has of course been plaguing me, because it has been contrary to everything I did. I have had a lot of consequences from this.

It seemed to me terribly ironic that of all people that this should happen to me.

I was trying to be very careful. I knew I was dealing with a very, very sensitive situation. I wouldn't let anybody handle it, not because I enjoyed it or wanted to have any ax to grind or any benefit. I knew the company had a severe problem and I really thought I could handle it.

I have been trying to rationalize it. Maybe what you said yesterday was the answer. I don't know; you know, the "up periscope".

I don't think there is any—maybe I rationalize it in another way. I knew I was going public. Maybe that had some effect on me. I don't know. I didn't expect to talk to MacCallum. I guess maybe that partly threw me. And he said, "60 cents." I just kind of responded.

What else can I say, your Honor?

Extrinsic evidence of Schuman's lack of *scienter* is substantial. For one, there is the absence of trading by him or for his benefit. Furthermore, among the exhibits proffered by plaintiff are analysts' publications expressing the view that BOL was not an open-mouthed concern. One, dated March 2, 1972, and issued by FDS over MacCallum's name, includes the sentence, "[t]he company is difficult to communicate with." Loeb Rhoades, in a "Company Contact Summary" of January 18, 1972, stated, "[t]he company as consistent with its past practice is not providing information to make an informed estimate on shipments but we believe sales by some doctors are strong."

Testimony adduced at trial reinforced this impression and confirmed the notion that Schuman's slip was uncharacteristic and inadvertent. MacCallum said that, "Mr. Schuman was a relatively difficult man to speak with," and "I feel that Mr. Schuman's answers to me were relatively vague, vaguer than the normal flow of answers from companies with which I speak. He certainly never offered information. He certainly did not expand." Consequently, when Schuman gave him the earnings figure over the telephone on March 16, MacCallum's reaction was astonishment.

Very soon after the second telephone call to MacCallum, Schuman telephoned Dorfman, in order to "go public" with the information he had released. Although a better procedure could have been followed, it is well to re-state the 1968 words of then SEC Commissioner Smith:

> Of course, we are all human, and there may be times when information of an extraordinary nature slips out, either in answer to a perceptive question or in the course of a heated discussion. In that case the corporation should issue a press release as soon afterwards as possible.
>
> \*  \*  \*  \*  \*  \*
>
> Of course, I recognize that, in answer to an especially perceptive question, a corporate official may on occasion say something that he did not intend to disclose in this manner. If he promptly arranges for the publication of this information and requests the analyst not to use it until this has been accomplished, I don't think that the corporate official should be censured because of a purely understandable mistake that he properly sets out to correct.

As Schuman testified:

> A press release has been generally a rather painful thing to get out. It takes time, and generally we do it with a lot of people. A lot of things are in that pot, and I didn't think I had the time or the luxury to go through that whole process,
>
> . . .

Certainly, Schuman's haste to disseminate the leaked earnings figure belies any intent to deceive, manipulate, or defraud.[4]

---

4. The requisite standard of culpability in 10b–5 actions has been the subject of much commentary and some case law. *See* Campbell, *Elements of Recovery Under Rule 10b–5: Scienter, Reliance, and Plaintiff's Reasonable Conduct Requirement,* 26 S.C.L.Rev. 653 (1975); Bucklo, *Scienter and Rule 10b–5,* 67 N.W.U.L. Rev. 562 (1972).

In *Hochfelder,* in requiring "*scienter,*" the Supreme Court used that word to mean, "a mental state embracing intent to deceive, manipulate, or defraud." The Court conceded that, "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." As the plaintiffs in *Hochfelder* based their claim on negligence, the Court found it unnecessary to determine whether recklessness would suffice for civil liability under § 10(b) and Rule 10b–5. 425 U.S. at 194, n. 12, 96 S.Ct. at 1381. Of course, it never reached the question of what constitutes reckless conduct in this context.

Prior to the *Hochfelder* decision, the Second Circuit in a private action, *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1305 (2d Cir. 1973), referred to a prior decision and stated:

> Under the *Shemtob* [*v. Shearson, Hammill & Co.,* 448 F.2d 442, 445 (2d Cir. 1971)] test, a plaintiff claiming a violation of Rule 10b–5 who cannot prove that the defendant had actual knowledge of any misrepresentations and omissions must establish, in order to succeed in his action, that the defendant's failure to discover the misrepresentations and omissions amounted to a willful, deliberate, or reckless disregard for the truth that is the equivalent of knowledge.

The Court went on to conclude, "[i]n sum, we believe that proof of a willful or reckless disregard for the truth is necessary to establish liability under Rule 10b–5." 479 F.2d at 1306.

Citing *Lanza v. Drexel & Co., supra,* Judge Pollack of this Court recently stated that, "[a]ctual knowledge, or a reckless disregard for the truth which is equivalent to actual knowledge, is a prerequisite to the imposition of civil liability for a violation of Rule 10b–5 in this Circuit." *Katz v. Realty Equities Corp. of New York,* 406 F.Supp. 802, 805 (S.D.N.Y.1976). The Second Circuit has distinguished private actions from SEC injunctive suits, however, basically on the reasoning that the latter seek to vindicate the public interest through prophylactic relief. In the latter, therefore, a negligence standard has been found sufficient to establish liability. *Management Dynamics, supra* at 809; *Spectrum, supra* at 541.

A careful analysis of *Hochfelder* has convinced this Court that the distinction is no longer to be drawn and that the identical standard under § 10(b) and Rule 10b–5 must be applied whether the plaintiff is the SEC or a private litigant. Inasmuch as the Supreme Court did not address itself to a definition of reckless behavior which would suffice for culpability, however, the Second Circuit opinions which do deal with this issue, are helpful. Their language, coupled with the Supreme Court's emphasis that *scienter* means *intent* to deceive, manipulate, or defraud leads to a conclusion that only what Judge Friendly has characterized as "the kind of recklessness that is equivalent to willful fraud," *TGS, supra* at 868, will serve as a basis for liability.

Though hardly to be recommended, Schuman's disclosure to MacCallum over the telephone on March 16 cannot be likened to constructive fraud. His conduct was not recklessness bordering on intent to deceive, manipulate, or defraud.

It is clear that Schuman was charged with, "the duty of the chief executive officer of a publicly held company to avoid private disclosure . . . ." *Geon, supra* at 47. This duty and the nature of conduct constituting an actionable breach thereof were thoughtfully discussed in *Lum's.*

It is instructive to compare the instant case with the facts out of which *Lum's* arose. There, Chasen, the chief operating officer of the defendant corporation, was the recipient of information that earnings were likely to be considerably lower than had been anticipated. He passed this intelligence on to Simon, a registered representative and institutional salesman for a broker-dealer firm.

Simon and Lum's had an understanding that Simon was to be informed of important corporate developments so that his clients would not think him unprepared; "a practice presenting a potential for abuse." 365 F.Supp. at 1058–59. One such client was IDS. Simon proceeded to convey the information to certain IDS employees who, acting upon it, sold all the Lum's stock in portfolios under their control.

In discussing Chasen's culpability, the Court conceded:

> Granted that what constitutes negligent conduct in this type of situation is far from clear, it is evident that Chasen owed a primary or fiduciary duty to the investing public not to abuse his position as insider in possession of confidential corporate information by disclosing it to someone who might use it for personal purposes. Put somewhat differently, the issue could be expressed in terms of whether Chasen had a legitimate corporate purpose in disclosing the earnings projections to Simon. See 2 Bromberg, Securities Law, § 7.5(3)(d) (1971).
>
> \* \* \* \* \* \*
>
> [The understanding between Simon and Lum's] is just the sort of selective disclosure for personal purposes that ultimately works unfairness in the markets: some people are better informed and thus can conduct better analyses, in reaching decisions to act, because of unfair advantages not enjoyed by others—even if they do not take direct action on the specific information conveyed. Thus I conclude that Chasen breached his duty by transmitting the information to Simon, and should be liable for the foreseeable consequences of that act.

365 F.Supp. at 1058.

The Court identified a second prong of the negligence question: "should Chasen have known that Simon would pass along the confidential information to his clients?" This question was answered affirmatively, the Court concluding that it was not "reasonable under the circumstances," for Chasen to believe that Simon would "keep the faith." A finding of negligence resulted.

The instant facts are very different. Schuman's decision to "go public" with a figure after learning of the $.60 rumor and his determination to call MacCallum's office would not, in themselves, have created liability. At least arguably he was acting for a legitimate corporate purpose. The advice of then General Counsel Loomis is worthy of note:

> I do feel that a service might be done by corporate management in calling attention through the appropriate channels to the institution whose forecasts have been circulated around the market that, in the opinion of management, that is just plain wrong.

By all accounts, the disclosure itself seems to have simply "popped out," quite without premeditation. But, the revelation could clearly serve no corporate purpose.

Should Schuman have realized that the information would be passed along? His estimates were higher than those of MacCallum. MacCallum's slightly lower figure had already been disseminated; the rumor mill had already attributed it to Schuman. This state of affairs rendered the impact of Schuman's disclosure far less devastating than it might have been. Although, to be sure, a "tip," "takes on an added charge just because it is inside informa-

The SEC contends that in this injunctive proceeding *Hochfelder* does not compel a determination that Schuman intended to favor certain "tippees" by providing non-public information, stating:

> Regardless of Schuman's state of mind, public investors are unjustifiably penalized by the possession of insider information by a favored few. . . . Intent to give traders an unfair advantage or a lack of such intent by the tipper, does not in the least affect the harm visited upon the public.

In so arguing, the Commission reiterates its approach before the Supreme Court which has already responded:

> The Commission then reasons that since the "effect" upon investors of given conduct is the same regardless of whether the conduct is negligent or intentional, Congress must have intended to bar all such practices and not just those done knowingly or intentionally. The logic of this effect-oriented approach would impose liability for wholly faultless conduct where such conduct results in harm to investors, a result the Commission would be unlikely to support. But apart from where its logic might lead, the Commission would add a gloss to the operative language of the statute quite different from its commonly accepted meaning.

*Hochfelder, supra* 425 U.S. at 198–99, 96 S.Ct. at 1383.

Reviewing the entire record in this case, the Court finds much of it inconclusive. The SEC has established only one instance in which Schuman disclosed material non-public information. That this disclosure was "in connection with the purchase or sale of a security" for purposes of Rule 10b–5 is in some doubt. And, the Commission has not proven that Schuman acted with the requisite *scienter.* BOL's liability for Schuman's act derives from his status as Chairman of the Board. *See, Geon, Lum's.*

A finding of no violation by him exculpates the company. Consequently, this Court finds that defendants BOL and Schuman did not violate § 10(b) and Rule 10b–5.

*Injunctive Relief*

■ Although the bulk of this opinion has been devoted to reaching the conclusion that no violation has been proven, this determination is ultimately secondary. The relief sought in this action is an injunction. Even had a violation been established, the record before the Court does not warrant the grant of this extraordinary remedy.

The SEC simply has not convinced this Court that absent an injunction there is a reasonable likelihood that defendants will violate the securities laws in the future. *Management Dynamics, supra* at 807; *Manor Nursing Centers, supra* at 1100–01.

The Second Circuit has indicated that "[w]hether the inference that the defendant is likely to repeat the wrong is properly drawn, however, depends on the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *Management Dynamics, supra* at 807. Assuming *arguendo* that a violation had been proven, the facts which would form its predicate appear to have been no more than an isolated occurrence. In contrast is the finding held to support the grant of an injunction in *Manor Nursing Centers, supra* at 1101: "appellants' 'violations were willful, blatant, and often completely outrageous.'"

The Commission's efforts to prove "similar acts" were not convincing. The Court finds no pattern of past violations suggesting that defendants should be enjoined.

The words of the United States District Court for the Northern District of California are in point:

> "An injunction in an SEC action is a drastic remedy, (*Securities Exchange*

---

tion," *Geon, supra* at 48, when rumors have already circulated to the effect that an earlier piece of information was a "tip," this charge is greatly lessened.

Schuman believed that he was correcting a mistaken impression that was liable to affect

the market in BOL stock. Judged on a "reasonable man" standard, his conduct might justify a finding of negligence. This question need not be reached since Schuman's behavior certainly does not establish recklessness verging on intent to deceive, manipulate, or defraud.

*Commission v. Franklin Atlas Corp.,* 171 F.Supp. 711, 718 (S.D.N.Y.1959),) historically designed to deter, not to punish. *Hecht Co. v. Bowles,* 321 U.S. [321] 329 [64 S.Ct. 587, 88 L.Ed. 754] (1944). Injunctions in SEC actions are 'subject to principles of equitable discretion.' *Hecht Co. v. Bowles,* 321 U.S. [321] 327 [64 S.Ct. 587, 88 L.Ed. 754] (1944). In the absence of a showing that further violations are to be reasonably expected, this court does not believe any injunction is appropriate. Despite SEC arguments to the contrary, what it seeks is more than a mere prophylactic related to the specific facts of the case. The broad, all-encompassing injunction sought here against any conceivable future violations carries the strong inference that the court believes the defendants *would* violate the law but for the court's intercession, an inference this court believes to be too heavy to place on these defendants on as inadequate a showing as has been made here." *SEC v. Koracorp Industires, Inc.* [1975–1976 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 95,532 (N.D.Cal. March 26, 1976).

The permissible scope of corporate communication with security analysts has yet to be authoritatively defined. As noted by this Court at the conclusion of trial, injunc-

tions as extraordinary remedies, should be issued when they are needed in extraordinary situations and should not be utilized generally in lieu of administrative regulations.[5]

The Commission has asked not only that the defendants be enjoined from future violations but that they also be ordered:

> to adopt, implement and maintain written procedures designated to assure their compliance with Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder insofar as that Section and Rule prohibit the private disclosure of inside information.

There is authority for such an order. *Lum's supra* at 1067.

After the trial of this action was concluded, attorneys for the company presented this Court with a copy of a memorandum entitled "Disclosure of Company Information," purporting to reduce to writing BOL's policies and procedures on this subject. Although this may or may not satisfy the Commission's quest for written procedures, this Court observes as did the Second Circuit in *Geon, supra* at 55, that:

> Indeed, even without this judicial remedy, the SEC and the stock exchanges have administrative procedures at their

---

**5.** This Court is not the first to suggest that the SEC provide concrete guidance. In 1969, then Commissioner Smith observed:

> In the *Texas Gulf* case itself the Court of Appeals for the Second Circuit suggested that the Commission promulgate further rules to clarify how soon after a public announcement insiders may trade upon the basis of important information contained in the announcement. Since then, thoughtful persons have lined up on both sides of the question of whether rules or guidelines are really feasible or desirable. Recently, the press gave coverage to my own comment sympathizing with those urging that an effort be made at devising guidelines in the area of inside information.
>
> Too often, it seems to me, we debate abstractly among ourselves whether or not something is feasible or desirable but never get down to trying it. Instead of continuing the debate, or whatever you want to call it, over guidelines, perhaps we should set forth a systematic discussion of this particular segment of the insider information area. We

> should not delude ourselves that the attempt will necessarily be successful or that it is a simple matter. The trouble with any rule-making process, as anyone who has lived through it must know, is that when you start drafting specific rules, it leaves room for and gives access to doing the very thing you are trying to prevent. That doesn't bely the need to make the effort, but we can't assume that it is a simple chore or one that will necessarily provide any greater degree of certitude than we now have. A well researched, ranging treatment of the subject by the Commission might not end up more informative or much different than many of the guidelines that have already been suggested by private individuals and groups. They would, however, bear an authoritative basis that could give some guidance and assurance to the many persons of integrity who are eager to comply with the law. The Commission, in my opinion, should make every effort to provide guidance where that is possible. I think I have said enough as a basis for discussion and "quest." Thank you.

**1246**

disposal which can be more easily adapted to the introduction of new procedures in the industry as a whole than can injunctive relief in this single case. The need for the injunctive remedy on the facts here present is not pressing.

Accordingly, the application for a permanent injunction is denied.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

Settle judgment on notice.