**STATE TEACHERS RETIREMENT BOARD, et al., Plaintiffs,**

v.

**FLUOR CORPORATION and Manufacturers Hanover Trust Co., Defendants.**

**No. 76 Civ. 2135 (RWS).**

United States District Court, S.D. New York.

June 30, 1983.

Schwartz, Shapiro, Kelm & Warren, Columbus, Ohio, for plaintiff by Russell A. Kelm, Columbus, Ohio, of counsel.

Cahill, Gordon & Reindel, Fluor Corp., New York City, for defendants by Raymond L. Falls, Jr., Charles A. Gilman, John A. Shutkin, New York City, of counsel.

Kelley, Drye & Warren, New York City, for defendant Manufacturers Hanover Trust Co. by Richard J. Concannon, Robert E. Crotty and Geraldine M. Boylan, New York City, of counsel.

## OPINION

SWEET, District Judge.

Defendants Fluor Corporation ("Fluor") and Manufacturers Hanover Trust Company ("Manufacturers") have moved for partial summary judgment limiting the class recovery in this securities fraud case and for summary judgment to dismiss the fourth amended complaint which includes a claim based on the transmission by Fluor to Manufacturers of certain alleged inside information (the "laundry list") alleged to be the subject of a conversation between representatives of the two defendants on February 24, 1975. Once again, this class action securities case has demonstrated its quicksilver character which has made it a difficult case to contain and decide. Familiarity with the background and the prior opinions of the Court of Appeals and this court as set forth in *State Teachers Retirement Bd. v. Fluor Corp.,* 500 F.Supp. 278 (S.D.N.Y.1980), *aff'd in part, rev'd in part,* 654 F.2d 843 (2d Cir.1981); *State Teachers Retirement Bd. v. Fluor Corp.,* 76 Civ. 2135 (S.D.N.Y. Sept. 27, 1982); and *State Teachers Retirement Bd. v. Fluor Corp.,* 76 Civ. 2135 (S.D.N.Y. Mar. 30, 1982), is assumed. The motions will be denied as set forth below, except to the extent indicated herein.

*Prior Proceedings*

Initially, the action brought by State Teachers Retirement Board ("State Teachers") as class representative was viewed by the court as presenting a claim of violation of the securities laws, section 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.-10b–5, arising out of a tip alleged to have been given to Manufacturers by Fluor on February 24, 1975 concerning the South African Coal, Oil and Gas Corporation Limited ("SASOL") contract, a $1 billion construction project on which Fluor had become the successful bidder. During the conversation, certain additional information was also conveyed, the laundry list, some twenty-one discreet items of information, the details of which were discovered by State Teachers as the action proceeded through pretrial discovery. Leave to amend the complaint to add the laundry list was denied as coming too late in the course of the litigation, a denial found by the Court of Appeals to be an abuse of discretion by the district court. *State Teachers Retirement Bd. v. Fluor Corp., supra,* 654 F.2d at 855–856. In addition, on the subject of the laundry list, the Second Circuit stated:

> The alleged tipped information (relating, *inter alia,* to the increase in Fluor's backlog, projections of increases in Fluor's earnings per share, and the likelihood of Fluor obtaining projects other than SASOL II) appears to be material. The fact that soon after the information was tipped Manufacturers almost doubled its holdings of Fluor stock underscores the materiality of this information.

*Id.* at 855.

Thereafter, on December 29, 1982, the fourth amended complaint was filed alleging that the transmission of information contained in the laundry list constituted additional tips. On March 17, 1983, Fluor and Manufacturers sought by partial summary judgment to limit their liability by invoking a "cap" as described in *Elkind v. Liggett & Myers,* 635 F.2d 156, 172–73 (2d Cir.1980). Upon argument of that motion, they were confronted with a claim for damages based not only on the SASOL tip, but also on the laundry list, a claim which Fluor and Manufacturers have characterized as the "new theory" of State Teachers. To meet this challenge, defendants then proceeded to move to establish that the laun-dry list failed to constitute material, non-public inside information tipped to Manufacturers with scienter. What appeared to be prudence at the time dictated that both motions be decided at the same time.

The jury trial of this action had been set for April 18, 1983 and then for April 25, 1983. The pendency of the current motions, however, has required the postponement of trial once again. Discovery, except perhaps for the testimony of experts, is substantially complete.

*The Facts Relating to the Motions*

On February 24, 1975, Lester Winterfeldt ("Winterfeldt"), an investment analyst of Manufacturers, met with three executive officers of Fluor, Paul Etter, David Tappan and J. Robert Fluor, at its California headquarters. In his conversation with Etter, Winterfeldt posed certain questions which he had previously prepared on notepaper and he noted Etter's answers on the same sheet. This scratch pad from which the laundry list was derived has become the focal point of these motions.

Following this conversation, Winterfeldt returned to New York, met with the Manufacturers Investment Committee on March 4 and 5, and gave reports about his trip. From March 3 to March 6, Manufacturers purchased 208,600 shares of Fluor stock. Manufacturers' average price for the 208,-600 shares was $22.20. From March 3 to March 6, 1975, State Teachers sold its Fluor holdings of 288,257 shares at an average price of $22.18 per share, some of which were purchased by Manufacturers.

During this period there was a heavy volume of transactions in Fluor stock, and trading was halted on March 7, 1975. It was resumed on March 10, after a press release was issued which dealt with the announcement of the SASOL contract. On March 11, Fluor's closing price was $24.125, on March 13 it closed at $27, and by June 27, 1975 it had risen to $48. By February 6, 1976, the time of the issuance of its 1975 Annual Report, the closing price was $35.50.

The laundry list of twenty-one items, (a)–(u), can be characterized as containing fi-

nancial projections, items (a)–(d), (e), (k), (n), (o), (q), information concerning particular projects, items (f), (g), (h), (j), (p), and (r), and items of overall Fluor policy, items (*l*) and (s). Two of the items are conceded by State Teachers to have been made public prior to February 24, 1975, the discovery of oil in Greece, item (m), and the anticipated write-off of $6.0 million in real estate, item (t), and these items have been abandoned by State Teachers. State Teachers claims that the remaining items, except for items (g), (h) and (u), which were never the subject of a public release, were publicly disclosed at various times during the months following the disclosure of the SASOL contract, and that it was not until February 6, 1976, when Fluor issued its 1975 Annual Report, that all the allegedly material, non-public information was finally disclosed or became moot.

### The Relief Requested

The defendants seek the dismissal of the fourth amended complaint in which the laundry list is added to the prior claims. In so doing, Fluor and Manufacturers attempt to demonstrate that each item on the laundry list fails to have at least one of the necessary elements of tipping liability, either that it was not non-public, material or transmitted with scienter. *See State Teachers Retirement Bd. v. Fluor Corp.,* supra, 654 F.2d at 854–55; *Elkind v. Liggett & Myers, Inc., supra,* 635 F.2d at 165–68.

While clearly the motion may raise appropriate issues, as for example, the inclusion of items conceded to have been public, items (m) and (e), it reaches too far, for not all the laundry list items lack a requisite attribute as a matter of law.[1] Therefore, the motion in its entirety, that is, dismissal of the fourth amended complaint, must be denied, but as to certain particular items, there can be no factual dispute as to their failure to constitute material, non-public tipped information. Thus, in effect, the

rulings herein amount to "partial, partial summary judgment" as to particular items, and, of course, no evidence *will be* permitted at trial on these items.

Finally it must be noted that the denial of summary judgment as to the entire laundry list requires a solution of the appropriate measure of damages, an issue not easy to grasp or resolve in the context of this case. In denying the defendants' motion for partial summary judgment, I am determining to some extent the law to be applied by the jury in its calculation of damages.

### Discussion

██ The court in considering a motion for summary judgment must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Friedman v. Meyers,* 482 F.2d 435, 438–39 (2d Cir.1973). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

██ The defendants' principal attack on the laundry list is that the information allegedly discussed with Winterfeldt was "widely known to the investing public" prior to February 24, 1975, and therefore, that the information was not "non-public." Many financial analysts' reports, press releases, public filings, and newspaper articles issued prior in time to the alleged tip, are cited to demonstrate that the information conveyed to Winterfeldt was already in the marketplace at the time of the alleged tip. In addition, the defendants argue that even if the information was non-public, the projections are so "speculative and futuristic" as to lack the requisite materiality.

With respect to the substantial number of analysts' reports and newspaper articles, financial and project projections from the company stand on a different footing from

---

1. It should be noted that the two principal cases upon which the defendants rely concerning the elements of section 10(b) violation on this summary judgment motion, *Elkind v. Liggett & Myers* and *SEC v. Bausch & Lomb, Inc.,* were decided *after* nonjury trials, upon full factual records.

those of the outside analyst. The fact that others may have anticipated the projections does not as a matter of law vitiate the information's non-public quality when transmitted by the company to a single analyst. Management is likely to be aware of underlying assumptions which may be unknown to an outside analyst.[2] Of course, the universality of the projections by others may well impact materiality, but that is properly a matter for jury determination.

█ With respect to materiality, part of the tension in the decision-making process derives from the "mosaic" concept articulated in *Elkind* in connection with the question of the material, non-public aspect of the information revealed:

> The corporate officer dealing with financial analysts inevitably finds himself in a precarious position which we have analogized to "a fencing match conducted on a tightrope." *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 9 (2d Cir.1977). A skilled analyst with knowledge of the company and the industry may piece seemingly inconsequential data together with public information into a mosaic which reveals material non-public information. Whenever managers and analysts meet elsewhere than in public, there is a risk that the analysts will emerge with knowledge of material information which is not publicly available.

*Elkind v. Liggett & Myers, Inc., supra,* 635 F.2d at 165 (footnote omitted).

Although the information may be seemingly insignificant and in some instances speculative, if it completes the mosaic, or "the matrix", and it is non-public, it may be material if "there [is] a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 439, 449, 96 S.Ct. 2126, 2127, 2132, 48 L.Ed.2d 757 (1976); *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 15 (2d Cir.1977). Of course, State Teachers asserts through its experts and its counsel that it is not any particular item on the laundry list that counts, but rather, it is the totality of the list and its overall impact on potential buyers and sellers that must be considered.

The "mosaic" concept, it would seem, is also relevant in considering the weight to be given to market movement. Certain of the projections were released in due course, and the defendants have established that release of certain items of information failed to result in any significant market movement. The defendants urge the conclusion that failure of any item of information to affect market prices when it was released demonstrates as a matter of law its

---

2. In *Elkind v. Liggett & Myers,* the Second Circuit recognized that the S.E.C. and stock exchanges "have taken the view that meetings and discussions with analysts serve an important function in collecting, evaluating and disseminating corporate information for public use." 635 F.2d at 165 (footnote omitted). However, "the reconciliation of this outlook with the SEC's mandate that material facts may be disclosed to investors, provided they are made available to all (through filings with the SEC) and not merely to analysts *has led to a case-by-case* approach." *Id.* at 166 (footnote and citation omitted) (emphasis added). Similarly, in *SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226, 1231 (S.D.N.Y.1976), *aff'd,* 565 F.2d 8 (2d Cir.1977) the Hon. Robert J. Ward, reviewing the views of the S.E.C. as to the appropriate scope of conversation between securities analysts and corporate insiders, stated:

> The available guidance, scanty as it was, suggested that corporate officials should conduct themselves reasonably and that this standard

would permit general discussion out of which a skilled analyst could extract pieces of a jigsaw puzzle which would not be significant to the ordinary investor but which the analyst could add to his own fund of knowledge and use toward constructing his ultimate judgment. Discussions with analysts regarding earnings prospects, trends in products, operating conditions, and the implications on earnings of a particular volume of business were approved. Responses to "ball park" estimates were deemed proper. This, of course, assumed management was "not trying to give their stock a little jiggle," and did not "go overboard."

(footnote omitted). In connection with this action, whether the management was "trying to give their stock a little jiggle" and whether they went "overboard" are questions of fact for the jury. Whether the information "merely fills 'interstices in analysis,' or 'tests the meaning of public information,'" *SEC v. Bausch & Lomb, Inc.,* 565 F.2d at 14, is for the jury to decide.

immateriality. While the lack of market movement certainly is persuasive evidence of immateriality, particularly with respect to the items conceded to never have been disclosed, it is not so conclusive in and of itself as to warrant dismissal of an item which may or may not be a coordinate in the "matrix." Lack of market effect alone fails to remove the issue of its materiality as a matter of law from the jury's consideration in view of the matrix concept set forth in *Elkind*.

*The Financial Projections*

█ The first projection alleged is that the 1975 earnings would be closer to $3.00 than the projection made by Winterfeldt, claimed by State Teachers to have been $2.75 and by the defendants as $3.25, item (a). The prior disclosures cited by the defendants are not equivalent to the "would be closer" prediction. It is the fact that the company made the projection, rather than the number projected, that gives the projection its "inside" quality. Obviously, materiality may be difficult to prove if it is established as a matter of fact that Winterfeldt had genuinely predicted $3.25.

Regarding Fluor projections relative to Fluor's backlog for the first quarter of 1975, item (b), its 1975 year-end backlog, item (c), its new orders for 1975, item (d), its 1976 earnings per share and backlog, item (e), its 1975 income statement, item (k), its 1975 operating profits for divisions other than those operating oil and gas, item (o), the defendants attempt to show that such projections were obvious and could generally be anticipated from information already in the market, generated either by Fluor or outside analysts. However, in the absence of a specific disclosure by Fluor of the actual projection, whether such projections were obvious and could generally be anticipated from preexisting public information goes to the issue of materiality, a factual issue for the jury.

The "specific projections for the Kilsby, Republic, and Bonner & Moore divisions of Fluor performance for 1975," item (i), were not previously disclosed by Fluor, although figures for those divisions were given in the 1974 Fluor Annual Report mailed on February 5, 1975, as pointed out by the defendants. Again, the extent to which such figures impair materiality is for the jury to decide.

With respect to the $125,000 1975 operating loss projection for the Deepwell division, item (q), Fluor appears to have had no "Deepwell division," but it did have a Deep Oil Technology subsidiary which suffered a loss in 1975 of $413,000, rather than $125,000. Neither figure could be material to Fluor, given Fluor's 1974 revenues of $801 million, earnings of $33.2 million and an order backlog of $4.4 billion.

The capital expenditures projection of $100 million for 1975, item (n), could well have been material. However, it was first projected at a security analysts meeting in October, 1974, and then contained in the 1974 Annual Report to Shareholders, mailed to all shareholders on February 5, 1975. It was therefore public information.

*Project Projections*

The equipment delays affecting Fluor's profits adversely during the first half of 1975, item (p), were the subject of statements by Fluor at the time of its 1974 Annual Shareholders' Meeting and were mentioned as delay affecting earnings in a release of December 9, 1974. In addition, Fluor's Annual Report for 1974 noted certain shortages which had affected Fluor's supply services business. At any rate, the negative information could not be material to the buy decision allegedly made by Manufacturers on the basis of inside information.

As far as particular project information is concerned, "that potential projects in Venezuela, Indonesia, South Africa and Saudi Arabia were likely to come on stream during 1975," item (f), potential projects in Indonesia and Saudi Arabia had been the subject of disclosure by the company, Indonesia at an analysts' meeting in October, 1974, and subsequently on January 28, 1975, and Saudi Arabia on January 9, 22, and 24. The defendants have failed to establish any disclosures by the company as to Venezuela.

With respect to the defendants' assertion that the SASOL claim should also be dismissed, the Second Circuit has already addressed the issue:

We believe the plaintiffs have presented sufficient evidence to raise an issue of fact over the non-public nature of the information given Winterfeldt. In his deposition, Etter, the Fluor Director of Investor Relations, states that the fact that Fluor was under consideration for the SASOL project was not public information. This testimony contravenes the conclusion that SASOL's consideration of Fluor for the project could be easily gleaned from publicly available information.

State Teachers Retirement Bd. v. Fluor Corp., supra, 654 F.2d at 854. Therefore, the potential project information concerning Venezuela and South Africa remains in the case.

In connection with the trans-Alaska pipeline project, the prospects for expansion and resulting revenue to Fluor "could represent $500–$750 million of additional revenue," item (g), and "$400 million in project revenue had been added to the Alaska pipeline project since October 31, 1974," item (k). The $500–$700 million projection was stated publicly on January 22, 1975. Previously, on September 6, 1974, Fluor had announced the award for the construction of a terminal and eight pumping stations worth approximately $1 billion. That the additional four stations could be awarded to Fluor was known; that $400 million had been added since October 31, 1974 was not, unless, of course, the $400 million since October 31, 1974 was included in the $500–700 million figure published in January. However, the difference of the expectation of $500–$700 expressed in the January 22 meeting and the award of $400 million allegedly reported to Winterfeldt could be said to make the information concerning the $400 million non-public. Proof of materiality, of course, will be difficult in light of the January 22 statement, but such remains a triable issue.

As to the increase of gross production of oil by Pertamina from 50,000 to 100,000 barrels a day by June, 1975, item (j), there had been projections to that effect by outsiders since Fluor's announcement in the fall as to the production capacity. Although these projections may have made the information less material, particularly in the light of Fluor's limited interest, still the projection as a company figure and its materiality remain properly an issue of fact.

That cancellation of the Arco, Sohio, Citgo and Colony Shale projects would cause a revenue decrease of $150 million, item (r), had been publicly announced on January 22, 1975, and the negative information was not material to a buy decision. The statement that "no further cancellations were anticipated," in the absence of an allegation that previously it was understood that further cancellations were anticipated, was also not information on which a buy decision could have been based, and was therefore immaterial for that purpose.

The significance of individual projects was described as "determinative of Fluor's performance" and Winterfeldt was told there was "no diminution of available work," item (u). At the 1974 Annual Meeting, Chairman J. Robert Fluor stated:

Today's projects are so much bigger than those we looked at two or three years ago that it will be difficult to put them into a proper perspective, compared with the backlogs we had several years ago. But backlogs will be bigger. One job could be $1 billion, and that is more than we ever had in the history of the company.

The significance of individual projects was certainly public. Similarly, no meaningful distinction can be made between "there is no diminution of available work", and the public statement of J. Robert Fluor at the 1974 Annual Meeting, "we have never before had the opportunities that are available to us today, and it is our intention to capitalize upon them to the maximum." At the January 22 analysts' meeting, Fluor officials stated that by the summer of 1975, several additional projects would be awarded. Item (u) did not constitute material, non-public information.

## Fluor Policy

There were no secrets as to management understanding of its shareholders' "dissatisfaction with Fluor's dividend policy", item (1). The preference of shareholders for cash dividends was acknowledged publicly at the 1974 Shareholders' Meeting. In addition, Fluor's management professed to follow a policy of continuously evaluating its dividend position in order to enable the stockholders to share in cash flow in its 1974 Annual Report and at its 1975 Annual Shareholders' Meeting. The awareness was neither non-public nor material.

Nor were there any secrets as to Fluor's ability to handle its cash flow and debt problems, item (s). The 1974 Annual Report reported its financial position as "strong" with $69 million plus available for use in 1975, short-term loan capacity up to $33 million, and only $7 million plus in long-term debt. In 1974, Fluor reported that it had been required to draw on only $1 million of its bank lines of credit. These public figures demonstrate the statement made to Winterfeldt on February 24, 1975, was merely a reiteration of recently published information.

No consideration is given to the scienter requirement in connection with the summary judgment motion because at a minimum, there is a factual issue of whether the information was in fact non-public and material: "One who deliberately tips information which he knows to be material and non-public to an outsider who may reasonably be expected to use it to his advantage has the requisite scienter." *Elkind v. Liggett & Myers, Inc., supra,* 635 F.2d at 167 (footnotes omitted). I note, however, that although courts have granted summary judgment where state of mind may be at issue, *see, e.g., Morgan v. Prudential Group Inc.,* 527 F.Supp. 957 (S.D.N.Y.1981), "summary judgment is likely to be inappropriate when issues concern intent," *S.E.C. v. Research*

*Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978).

In sum, the laundry list (by way of partial summary judgment) is reduced to the financial projections, the potential projects in Venezuela and South Africa, the specific projections for the Kilsby, Republic and Bonner & Moore divisions, the $400 million award in connection with the Alaska pipeline, and the addition to the Pertamina production projection.

With respect to these remaining items, on the question of disclosure, I have concluded only that there exist genuine issues of fact as to when they were made public. This conclusion does not preclude the defendants from proving at trial that the items were in fact disclosed prior to February 24, 1975.

Similarly, on the question of materiality, I have concluded only that there exist genuine issues of fact as to whether each of the items remaining is material. The defendants will doubtless argue to the jury that because outsiders were alluding to or projecting the same or similar information, the items are not material, since there is no substantial likelihood that a reasonable investor would view the disclosure of such information as having significantly altered the "total mix" of information already available, the information already being part of the "total mix." However, the issue remains as a question for the jury.

Further, on the issue of materiality, the defendants argue that the laundry list information consists of nothing but speculation and surmise, and is therefore not material.[3] However, I am reluctant to remove the issue of materiality from the jury's consideration in light of the "matrix" concept described above and in the face of the Second Circuit's observation about materiality in this very case:

> The alleged tipped information (relating, *inter alia,* to the increase in Fluor's backlog, projections of increases in Fluor's

---

**3.** The cases cited by the defendants in this connection were not disposed of upon summary judgment. *See, e.g., James v. Gerber Products Co.,* 587 F.2d 324 (6th Cir.1978); *Harkavy v. Apparel Industries, Inc.,* 571 F.2d 737 (2d Cir.1978); *Arber v. Essex Wire Corp.,* 490 F.2d 414 (6th Cir.), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974); *Radol v. Thomas,* 534 F.Supp. 1302 (S.D.Ohio 1982).

earnings per share, and the likelihood of Fluor's obtaining projects other than SA-SOL II) *appears to be material.*

*State Teachers Retirement Board v. Fluor Corp.,* 654 F.2d at 854 (emphasis added). Further, the Supreme Court has also stated that materiality is a question for the trier of fact:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 439, 450, 96 S.Ct. 2126, 2127, 2133, 48 L.Ed.2d 757 (1976).

### The Measure of Damages

■ The initial summary judgment, as noted above, sought to impose an *Elkind* cap on damages. In *Elkind,* the Second Circuit adopted the "disgorgement measure" of damages, limiting the total recovery to the tippee's gain—"the amount gained by the tippee as a result of his selling at the earlier date rather than delaying his sale until the parties could trade on an equal informational basis." 635 F.2d at 172. In *Elkind,* only one tip was found to be material, non-public inside information, and the disgorgement method of damage calculation presented none of the complications presented here.

The alleged SASOL tip has been the most significant of the information said to have been conveyed to Manufacturers. It has been so viewed by the parties and court since the inception of this action, and the disgorgement measure of damages prescribed by *Elkind* as applied to the alleged

SASOL tip is calculable and relatively certain, leaving aside differences between the parties as to what constitutes "a reasonable time after disclosure."

However, the laundry list, or the matrix, does not lend itself to the same treatment. For those items not found to have been immaterial or public prior to February 25, at least for summary judgment purposes, State Teachers, of course, will have to prove all the elements of a section 10(b) violation in order to recover. Some of the items may have become public after the SASOL contract became known, and to isolate each item and project its effect on the market the day it became public would be a speculative endeavor and indeed inconsistent with the matrix concept discussed above. Market movement unrelated to Fluor, intervening information concerning Fluor, and the passage of time between disclosures invite uncertainty, speculation and confusion regarding a determination of what profits should be disgorged from the defendants based upon the laundry list.

Further, there is not presently before the court, or indeed perhaps even available, Manufacturers' trading history with respect to its Fluor stock following the SASOL disclosure. To isolate the profit attributable to bits and pieces of the February 24, 1975, alleged inside information over the months following the SASOL disclosure would be an impractical and speculative endeavor.

For these reasons, it is impossible to adhere to a rigid application of *Elkind* with respect to the laundry list. The *Elkind* court itself urged remedial flexibility:

> We thus gave heed to the guidance provided by the Supreme Court in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972), to the effect that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' *Id.* [*SEC v. Capital Gains Research Bureau,* 375 U.S. 180], at 195 [84

S.Ct. 275 at 284, 11 L.Ed.2d 237 (1963) ]. This was recently said once again in *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12 [92 S.Ct. 165, 168, 30 L.Ed.2d 128] (1971)." *See also Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386, 391, 90 S.Ct. 616, 622, 625, 24 L.Ed.2d 593 (1970) (1934 Act does not "circumscribe the courts' power to grant appropriate remedies").

635 F.2d at 170.

In *Elkind,* where there was only one tipped piece of information subsequently disclosed, the court rejected a retroactive determination of the relationship between the value of the tipped information and the hypothetical market value of the shares. 635 F.2d at 170. Since the tip consisted of a sole item of information publicly disclosed the day after the tip, it was reasonable to assume that the change in the market price of the stock within a reasonable time after disclosure was the value of the tipped information. Here, however, if the jury finds that the remaining laundry list items were material, non-public, inside information, they cannot simply look at the market price of the Fluor shares after the SASOL disclosure to determine the value of the tipped information.

As State Teachers points out, the retroactive valuation of stock traded during the period of nondisclosure seemed unnecessarily speculative in *Elkind,* which, of course, lent itself to the more certain measure chosen by the Second Circuit. Retroactive valuation of the fair market value may nevertheless be appropriate in a case in which there is alleged to have been more than one tip. Aided by expert testimony, the jury could determine the value of the Fluor stock if all the material and non-public information had been simultaneously disclosed a reasonable time after disclosure of the SASOL contract. The measure of the class loss would be the difference between the selling price and the fair market value of the stock. The defendants' liability would still be limited to disgorgement of their wrongful gain, which would be tied to the retroactively-determined fair value.

I am aware, of course, that the Second Circuit rejected this measure of damages in the context of *Elkind,* indicating that the measure is, *inter alia,* too "hypothetical" and "speculative." *Id.* at 170. The expert valuation testimony proposed by State Teachers may indeed turn out to be too hypothetical and speculative, but that decision must be left for trial. I only note that the damages, if any, which are attributable to the laundry list items, are not susceptible to the method of calculation utilized by the court in *Elkind,* although that method will be applied to any damages relating to the alleged SASOL tip.

For the reasons stated above, the motions for summary judgment are denied except to the extent indicated herein. A pretrial conference will be held at the earliest convenience of counsel.

IT IS SO ORDERED.